## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **NEIL PERETZ and THAO LE, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**Cultural Care, Inc. d/b/a Cultural Care Au Pair**<br><br>**Defendant.** | **CASE NO. _____**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## I.      INTRODUCTION

1.      Plaintiffs, Neil Peretz and Thao Le ("Plaintiffs") bring this action under G.L. 93A and Massachusetts common law based on a deceptive pricing scheme that has caused them actual injury.

2.       Cultural Care, Inc. ("Cultural Care" or "Defendant") is effectively a broker or middleman arranging for au pairs in foreign countries to come to the United States to provide childcare to American families.

3.      Cultural Care's au pairs are generally young individuals whose families, across the world, typically pay Cultural Care to market their children as au pairs to American "host families" so that they can have the experience of living and working in the United States.

4.      Many of the au pairs whose services are advertised by Cultural Care provide less than a full year of childcare to the families who select them.  Au pairs leave the homes of their host familes prior to completing a full program year for myriad

reasons frequently including homesickness, inexperience, immaturity, cultural isolation, poor fit with the families that hire them, and lack of meaningful interest in childcare.

5.     Cultural Care, on the Internet and in other marketing materials for potential host families, advertises weekly and hourly rates for au pair services (sometimes stated as "average weekly and hourly rates").  In calculating its advertised "weekly" and "hourly" rates for au pair services, Cultural Care omits significant aspects of the cost of a Cultural Care au pair including, without limitation, the costs of travel, room and board.

6.     In addition, although Cultural Care is aware that many au pairs will not remain with the families who hire them for a full year, Cultural Care nevertheless deceptively advertises the services of its au pairs with a weekly and hourly rate that will never be the actual rate if the au pair completes less than a year of work.  Cultural Care not only ignores temporary childcare costs that arise during the replacement period and known program costs that will be duplicated in the process of engaging a substitute au pair, Cultural Care also charges each American "host family" a lump sum $7,995 "Program Fee" and has an undisclosed partial refund policy when au pairs leave their host families without replacement.  These factors mean that the advertised weekly and hourly rates are never valid for those families whose au pairs terminate employment prior to one year following their engagement.

7.     Cultural Care compounds its deceptive pricing advertisements in numerous ways, most prominently by using its falsely advertised weekly price as a basis for price comparison with other childcare options such as traditional day-care.  Daycare centers do not require payments of the costs that Cultural Care purposefully omits from its calculation of its weekly price including, without limitation, the costs of travel, room

and board. Similarly, daycare centers typically do not require lump sum payments as a condition of entering their programs. Nor do daycare centers typically have the option of simply walking away from their responsibilities in the middle of the year without full refunds of unearned fees.

8.      When it advertises its prices, Cultural Care also fails to provide its customers its partial refund policy so that host families can understand that the advertised weekly and hourly fees are never accurate when au pair service is terminated before the end of a program year.  Although Cultural Care does provide a version of its partial refund policy that applies to host family terminations, it never provides any refund policy that applies when an au pair chooses to terminate service prior to the end of a program year.

9.      Because Cultural Care profits from its partial refund policy, it has little incentive to help families that have made their full lump sum "program payment" find an alternate au pair when the originally hired au pair terminates employment early.

10.      Plaintiffs, for themselves and a Class of similarly situated individuals, seek relief under G.L. 93A for violations of Massachusetts' deceptive pricing regulations as well as for breach of contract.  Plaintiffs also seek relief individually for Cultural Care's breach of contract.

## II.      JURISDICTION

11.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d) because this class action is between citizens of different states; at least one member of the class of Plaintiffs is a citizen of a state different from the Defendant; a class action has been pled; the matter in controversy exceeds the sum or value of $5,000,000, exclusive of

interest and costs; and there are 100 or more members in the proposed classes.  28 U.S.C.
§ 1332(d).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because
the unlawful practices complained of emanate from this District, Cultural Care, Inc. is
headquartered in this District and it regularly conducts business in this District.

13.      The contracts at issue make Massachusetts law applicable to the claims at
issue, requires consent to jurisdiction in the courts of Massachusetts, and requires that
any case to enforce the contract be venued in Massachusetts.  The contract provides:  "the
parties hereby submit and consent to the exclusive jurisdiction and venue of the courts of
the Commonwealth of Massachusetts and of the United States District Court for the
District of Massachusetts."[1]

### III.     PARTIES

14.     Plaintiffs, Neil Peretz and Thao Le, are a married couple who reside in the
state of California.

15.     Defendant, Cultural Care, Inc., is a for-profit Massachusetts corporation,
with a principal place of business at One Education Street, Cambridge, Massachusetts
02141. Cultural Care, Inc., does business in Massachusetts and nationally as "Cultural
Care Au Pair."

### IV.     FACTUAL BACKGROUND AND ALLEGATIONS

16.     Cultural Care markets its services primarily on the Internet through its
website www.culturalcare.com.

17.     It advertises itself as "a flexible affordable childcare solution."

---

[1] See Exhibit D (identified below), at ¶ 25.

18.     Cultural Care's website asserts that it recruits au pairs through its offices around the world, but it does not prominently state that it profits both by charging the families of au pairs (or, in some cases, the au pairs themselves) for the service of placing their children as childcare workers in the homes of American families and by charging the host families large up front "program fees" and other charges.

19.     With respect to the price of service, Cultural Care's home page falsely states that the "average cost is just $8/hour for 45 hours of coverage (per family, not per child)."

20.     A true and correct copy of a screen shot of Cultural Care's homepage (as it existed on September 4, 2014) is attached hereto and labeled Exhibit A.

21.     On other pages on its website, Cultural Care falsely advertises a "weekly price" of $359.87 and uses that false weekly price as the basis for a deceptive price comparison with other childcare alternatives such as traditional day care centers and nannies.  Cultural Care Website, *available at*

http://culturalcareaupair.com/costs/program-costs/ (last visited on September 4, 2014)

22.     A true and correct copy of a screen shot of Cultural Care's "Program Costs" webpage (as it existed on September 4, 2014) is attached hereto and labeled Exhibit B.

23.     Cultural Care represents that au pair care is "the most affordable" childcare option.  *Id*. Its price comparison purports to show, for example, that the weekly price of a Cultural Care au pair at "$360" is $165 less than the average weekly cost of $525 for daycare from a traditional daycare provider. *See* Exhibit B.

24.     Cultural Care fails to state that its hourly and weekly price advertisements are based on a hypothetical set of circumstances that are *never* consistent with a host family's actual costs.  Among other things, Cultural Care's price advertisement does not include costs of room and board. Nor does it include required costs of domestic transportation, auto insurance, fulfillment of the au pairs' education requirement under United States State Department rules governing international au pairs,[2] and other required host family expenses in the au pair program.

25.     Cultural Care's hourly and weekly price advertisements also fail to account for the possibility that the au pair will not remain in a host family's home for a full year and that, when early termination occurs without replacement, Cultural Care will not provide a refund of its "$7,995" up front "program fee" consistent with its advertised hourly and weekly rates.

26.     Similarly, in the event of early termination with delayed replacement, Cultural Care's hourly and weekly price advertisements fail to account for costs of temporary childcare arrangements during the search for a replacement au pair as well as duplicate costs that arise when a family uses multiple au pairs in the same program period.

27.     Cultural Care's website provides the following basis for its calculation of its advertised weekly price:

---

[2] See Exhibit D (identified below), at ¶ 12.

**HOW DOES IT ALL ADD UP?**

+ $75 application fee

+ $300 match fee

+ $7,995 program fee

+ $195.75 stipend x 51 weeks

÷ 51 program weeks

**= $360 PER WEEK**

Cultural Care Website, *available at* http://culturalcareaupair.com/why-choose-us/our-advantage/ (last visited on September 4, 2014). This statement omits other costs of hiring a Cultural Care au pair including without limitation, transportation, room and board, as well as the frequent circumstance that the au pair will not provide "51 program weeks" of service. Each of those factors drive both the actual "per week" cost and the average weekly cost of a Cultural Care Au Pair significantly above $360 per week.

28.     A true and correct copy of a screen shot of Cultural Care's "Our Advantage" webpage (as it existed on September 4, 2014) is attached hereto and labeled Exhibit C. (*See* right column).

29.     Cultural Care applies a partial refund policy for its "program fee" – applicable to early termination by its au pairs without replacement - that is not provided to the host families.  The only refund policy provided applies only to termination *by the host family* and even that is not provided in conjunction with or contemporaneously to Cultural Care's price advertisements and price comparisons.

30.     The absence of full and timely information about the partial refund policy is deceptive and prevents host families from fully understanding one of the key reasons that the advertised hourly and weekly are false, deceptive and/or misleading.

31.     The calculable average hourly and weekly costs of a Cultural Care au pair are always higher than the amounts advertised by Cultural Care.

32.     Cultural Care maintains data about the actual number of hour and weeks its au pairs work each year and could use that data more accurately to calculate the actual average cost of childcare provided by a Cultural Care au pair.

33.     If Cultural Care accurately advertised the actual and/or average cost of childcare based on the Cultural Care model, the amounts would far exceed $8 per hour and $360 per week even before adding additional actual costs including, without limitation, transportation, room and board.

34.     Cultural Care's price advertisement of $8 per hour and $360 per week are false, deceptive and/or misleading whether calculated as actual or average prices.  The advertised prices are far below the actual and average costs of hiring a Cultural Care au pair.

35.     The price comparisons that Cultural Care uses as the basis for its statement that the au pair care it offers is the "most affordable" option for childcare are not based on proper calculation of  "average costs" for the reasons set out above and because those costs do not include necessary outlays including, without limitation, transportation, room and board that would not be required in connection with other childcare options such as traditional daycare from a daycare program.

36.     Cultural Care's price comparisons, based on an asserted weekly price of $360 per month are false, deceptive and/or misleading. The actual costs of a Cultural Care au pair do not justify the price comparisons on Cultural Care's website.  Nor do they justify a claim that Cultural Care is the "most affordable" option for childcare.

37.     Because Cultural Care takes its "program fee" up front (or offers financing arrangements to cover it), it has little incentive to work to find a substitute au pair quickly and efficiently when an au pair leaves before completing a year of service.

38.     Based on complaints that are publicly available on the Internet, Cultural Care frequently has failed to work in good faith to help find alternative au pairs for families whose au pairs leave before the end of a year of service. Moreover, Cultural Care fails to disclose the hidden costs of hiring an alternate au pair.

39.     Unless a replacement Cultural Care au pair is in place quickly and efficiently, not only do families incur costs for alternative childcare, they are further deprived of the benefit of Cultural Care's advertised hourly and weekly price.

40.     None of the written materials Cultural Care provides to host families correct or explain the false, deceptive and misleading price advertising and price comparisons made on Cultural Care's website.

41.     The homepage of Cultural Care's website advertises "97% of our families are pleased with the choice they made to use Cultural Care Au Pair."

42.     Cultural Care has no disclosed empirical factual basis for this statement.

43.     Cultural Care's false, deceptive and/or misleading price advertisements and price comparisons were made willfully and with knowledge of their falseness, as well as their capacity to deceive or mislead.

44.     The false, deceptive and/or misleading statements complained of in this complaint have been on Cultural Care's website and have been present in one form or another in Cultural Care's written marketing materials for at least the four years prior to the date of this Complaint.

## V.    PLAINTIFFS' FACTS

45.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

46.     Prior to signing a host family agreement with Cultural Care, the Plaintiffs reviewed the pricing information on Cultural Care's website, including both the hourly and weekly price representations and Cultural Care's price comparison with alternative forms of childcare.

47.     On March 26, 2013, Plaintiffs completed their initial registration with Cultural Care. On July 11, 2013, Plaintiffs completed their application.

48.     On or about March 26, 2013, Cultural Care sent the Plaintiffs a document labeled Host Family Agreement ("HFA") that purports to be a contract between Plaintiffs and Cultural Care.

49.     A true and correct copy of the HFA is attached hereto and labeled Exhibit D.

50.     On or about March 26, 2013, Cultural Care sent the Plaintiffs a separate document labeled Host Family Financial Responsibility Agreement ("HFFRA") that also purports to be a contract between Plaintiffs and Cultural Care.

51.     A true and correct copy of the HFFRA is attached hereto and labeled Exhibit E.

52.     Both the HFA and the HFFRA were drafted by Cultural Care and not the Plaintiffs.

53.     Based on their form and Cultural Care's business model, both the HFA and HFFRA are standard forms of contract that Cultural Care uses with all of its host families.

54.     On August 8, 2013, Cultural Care congratulated Plaintiffs for selecting Viktoria Salzmann as their future au pair.

55.     On August 5, Plaintiffs paid Cultural Care's "selection fee" of $175.00. Plaintiffs paid the remainder of the account balance of $8,155.00 to Cultural Care in full on August 16, 2013, including the entire program fee of $7,995.

56.     Ms. Salzmann arrived in California on September 20, 2013 and began serving as the Plaintiffs' au pair the following Monday, September 23, 2013.

57.     On October 14, 2013, Carey Welsh, the Plaintiffs' Cultural Care Local Coordinator requested that the Plaintiffs sign a "transition" form for Ms. Salzmann, after just three weeks of service. The transition form was designed to terminate Ms. Salzmann's service as an au pair for Plaintiffs' children.

58.     Neither Ms. Salzmann nor Cultural Care provided a reason to the Plaintiffs for Ms. Salzmann's termination of service.  Termination was made at the election of Ms. Salzmann and Cultural Care and not by the Plaintiffs.

59.     On October 15, 2013, the Plaintiffs received notification from Cultural Care that Salzmann would be leaving her position that coming Friday, October 18. Again, no specific reasons were given for Salzmann's departure.

60.     Paragraph 16 of the HFA states that no transitions would be processed in the first month of the au pair's service.

61.     Paragraph 17 calls for a transition period of two weeks if difficulties between the au pair and host family arise, during which time the au pair remains in the home and provides childcare if requested. The Plaintiffs were granted no transition period even though they explicitly requested one from their local coordinator.

62.     On October 18, 2013, Salzmann left the Plaintiffs home after just four weeks of au pair service.

63.     In an email dated October 18, 2013, though Cultural Care informed Plaintiffs of their "Matching Options" it does not provide any assistance or guidance in selecting a replacement au pair.

64.     On or about October 18, 2013, the Plaintiffs received a partial program fee refund of $4,508.00.  Since they had paid Cultural Care $8,330 in total for the program year, the limited refund means that the Plaintiffs paid Cultural Care $3,822 for just four weeks of au pair service.  In addition, they paid Ms. Salzmann $800 for her four weeks of childcare, as required by the HFFRA. In summary, they paid a total of $4,622 for four weeks of childcare or $1,155.50 per week.

65.     By another reckoning, Cultural Care's website advertises a fee of $360.00 per week. Plaintiffs received four weeks of childcare at $1,155.50 per week. They paid $795.50 per week more than Cultural Care's advertised price.

66.     A pro-rated refund of Cultural Care's $8,330 in program fees based on four weeks of service out of 52 would be $7,689.23.  The Plaintiffs refund was far less than the calculable pro-rated amount.

67.     Plaintiffs spent nearly two months of near daily back and forth with Cultural Care representatives attempting, without success, to obtain an informal resolution appropriate to their concerns including a prorated refund of the program fee because they had received just four weeks of au pair service.

68.     The Plaintiffs sent a demand letter pursuant to G. L. c. 93A, § 9 on December 11, 2013.

69.     Cultural Care failed to make a timely written tender of settlement that was reasonable in relation to the injury actually suffered by the Plaintiffs.

## VI.     CLASS ALLEGATIONS

70.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

71.     This class action is brought by Plaintiffs on their own behalf and on behalf of a Class consisting of all individuals nationwide who have hired a Cultural Care au pair in the time period beginning four years prior to the date of this Complaint.

72.     Plaintiffs also seek to represent a Subclass of individuals who have been subject to Cultural Care's partial refund policy because they engaged an au pair who chose to terminate the engagement prior to one year from the date of commencement.

73.     Plaintiffs seek certification of the Class and Subclass under Federal Rule Civil Procedure 23(a), and Rule 23(b)(2) and/or (b)(3).

74.     Plaintiff does not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendant. Based on representations made by Cultural Care that it has placed more than 95,000 au pairs since 1989, it is likely that Cultural Care has placed at least 1,000 au pairs each year for the last

four years, nationwide, thereby making joinder impracticable. There are at least hundreds of Class members affected by the early termination choice of an au pair each year making joinder of all Subclass members impracticable.

75.     All members of the Class have been subject to and affected by the same conduct. Plaintiffs and every Class member were subjected to an identical deceptive pricing advertisement scheme and the deceptive price comparisons outlined in this complaint.  All members of the Subclass were affected by the inconsistency between Cultural Care's pricing representations and its actual pricing taking account of the additional hidden costs of replacement and/or Cultural Care's partial refund policy.

76.     There are questions of law and fact that are common to the Class. These questions include, but are not limited to, the following:

> a.   Whether Cultural Care's advertised prices are false, deceptive, and/or misleading within the meaning of applicable regulations;
>
> b.   Whether Cultural Care's price comparisons are false, deceptive, unfair and/or misleading within the meaning of applicable regulations;
>
> c.   Whether Cultural Care's price advertisements and price comparisons constitute actionable violations of G.L. c. 93A, § 2;
>
> d.   Whether members of the Class are entitled to declaratory relief with respect to Cultural Care's violations of law; and
>
> e.   Whether members of the Class are entitled to injunctive relief to prevent Cultural Care's continued use of the price advertisements, price comparisons and poorly disclosed and incomplete partial refund policy described in this complaint.

77.     There are questions of law and fact that are common to the Subclass. These questions include, but are not limited to, the following:

    a.   Whether application of Cultural Care's improperly disclosed partial refund policy violates the contracts between Subclass members and Cultural Care;

    b.   Whether the application of Cultural Care's improperly disclosed partial refund policy is unfair and/or deceptive within the meaning of G.L. c. 93A § 2;

    c.   Whether members of the Subclass are entitled to reimbursement of hidden replacement costs and/or for properly prorated refunds of program fees when an au pair initiates early termination prior to the end of one year from the date of commencement of service;

    d.   Whether members of the Subclass are entitled to declaratory relief with respect to Cultural Care's violations of law;

    e.   Whether members of the Subclass are entitled to injunctive relief to prevent Cultural Care's continued use of the price advertisements, price comparisons and improperly disclosed partial refund policy described in this complaint.

78.     Each of the relevant common questions can be decided under Massachusetts law, because Cultural Care has, by contract, made Massachusetts law applicable to all disputes.

79.     The claims of the named Plaintiffs are typical of the claims of the Class and the Subclass.  They do not conflict with the interests of any other members of the

Class or Subclass in that the Plaintiff and other members of the Class and Subclass were subject to the same price advertisement, price comparisons and pricing policies.

80.     The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have substantial experience both in plaintiff class actions and in issues arising under G.L. c. 93A.

81.     Class members can easily be identified by review of records in possession of Cultural Care.

82.     The Defendant has acted or refused to act on grounds that apply generally to the Plaintiffs, the Class and the Subclass so that final injunctive relief or corresponding declaratory relief is appropriate for the Class as a whole.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because common legal and factual questions predominate, and because:

  a.  the losses suffered by the Class and Subclass members are such that prosecution of individual actions is impractical or economically infeasible;

  b.  the form of proof and discovery plan required to obtain proof is such that prosecution of individual actions is impractical or economically infeasible;

  c.  in the absence of the class action device, Plaintiffs, the Class and the Subclass would be left without a remedy for the wrongful acts alleged, and the Defendants would be unjustly enriched;

  d.  no unusual difficulties are likely to be encountered in the management of this action as a class action.

84.     An additional basis for finding superiority is that Cultural Care has, by contract, made Massachusetts the appropriate venue for all disputes. Absent a class action here, Class members across the country would face burdensome and unfair costs in light of the need to litigate in Massachusetts.

85.     Both the putative Class and the putative Subclass meet the requirements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3).

86.     A class action is also maintainable in this matter under G.L. c. 93A, § 9(2) which provides:

> Any persons entitled to bring [an] action [under G.L. 93A, § 9(1)] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; …

## VII.   CAUSES OF ACTION

### COUNT ONE
### (Class claim under G.L. c. 93A and regulations promulgated thereunder)

87.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

88.     Cultural Care has violated G.L. c. 93A § 2 with respect to the individual Plaintiffs and the Plaintiff Class by utilizing practices that were unfair and/or deceptive. The illegal practices include, without limitation:

      a.   Making false, deceptive and/or misleading statements about the price for its services that violate G.L. 940 C.M.R. § 3.02 (False Advertising); § 3.04 (Deceptive Pricing); 940 C.M.R. § 3.05 (General Misrepresentations); and 940 C.M.R. § 3.16 (General);

b. Making false, deceptive and/or misleading statements about the price for its services that create "a false impression of the … value…" of those services within the meaning of 940 C.M.R. § 3.02;

c. Making false, deceptive and/or misleading pricing statements that have "the capacity, tendency or effect of deceiving buyers or prospective buyers as to the past, present, common or usual price…" of those services within the meaning of 940 C.M.R. § 3.04;

d. Making false deceptive and/or misleading price comparisons that violate G.L. 940 C.M.R. § 3.02 (False Advertising); § 3.04 (Deceptive Pricing); 940 C.M.R. § 3.05 (General Misrepresentations); 940 C.M.R. § 6.05 (Price Comparison and Savings Claims); and 940 C.M.R. § 3.16 (General);

e. Making false deceptive and/or misleading price comparisons that "state or imply that it is offering … savings as to [its] product by making a direct or indirect price comparison, … without offering a clear and conspicuous basis for the price comparison" within the meaning of 940 C.M.R. § 6.05;

f.  Making false deceptive and/or misleading price comparisons to comparable services when there are substantial differences between the purportedly comparable services and the services being offered for sale by Cultural Care in violation of 940 C.M.R. § 6.05;

g. Making disclosures and representations that violate 940 C.M.R. 3.16; and

h.  Failing to disclose a partial refund policy that applies when an au pair terminates employment before the end of the program period in violation of 3.16(2).

89.   The aforesaid violations were knowing and willful within the meaning of G.L. c. 93A.

90.   The Plaintiffs and members of the Class were damaged by Cultural Care's violations of G.L. c. 93A.

## COUNT TWO
### (Breach of Contract by the Subclass)

91.   Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

92.   Cultural Care maintains an improperly disclosed partial refund policy, applicable to program fees, which applies when an au pair terminates service prior to the end of a full year from the date of commencement.

93.   The improperly disclosed partial refund policy is inconsistent with both the HFA and the HFFRA contracts as well as with Cultural Care's price advertisements.

94.   Cultural Care fails to provide pro-rated refunds of the "program fee" that are consistent with the number of weeks of service that a host family actually receives.

95.   The Subclass has been damaged by Cultural Care's breach of contract including, without limitation, by the difference between a prorated refund and the partial non-prorated refunds available under Cultural Care's improperly disclosed partial refund policy.

## COUNT THREE
**(Subclass claim under G.L. 93A and regulations promulgated thereunder)**

96.     Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

97.     Cultural Care has violated G.L. c. 93A § 2 with respect to the individual Plaintiffs and the Plaintiff Subclass by utilizing practices that were unfair and/or deceptive.  The illegal practices include, without limitation:

    a.   Making false, deceptive and/or misleading statements about the price for its services that violate G.L. 940 C.M.R. § 3.02 (False Advertising); § 3.04 (Deceptive Pricing); 940 C.M.R. § 3.05 (General Misrepresentations) ; and 940 C.M.R. § 3.16 (General) in situations in which an au pair terminates service within one year of the date of commencement;

    b.   Making false, deceptive and/or misleading statements about the price for its services when an au pair terminates service within one year of the date of commencement that create "a false impression of the … value…" of those services within the meaning of 940 C.M.R. § 3.02;

    c.   Making false, deceptive and/or misleading pricing statements that have "the capacity, tendency or effect of deceiving buyers or prospective buyers as to the past, present, common or usual price…" of those services within the meaning of 940 C.M.R. § 3.04 in situations in which an au pair terminates service within one year of the date of commencement;

d.  Making false deceptive and/or misleading price comparisons that violate G.L. 940 C.M.R. § 3.02 (False Advertising); § 3.04 (Deceptive Pricing); 940 C.M.R. § 3.05 (General Misrepresentations); 940 C.M.R. § 6:05 (Price Comparison and Savings Claims); and 940 C.M.R. § 3.16 (General) in situations in which an au pair terminates service within one year of the date of commencement;

e.  Making false deceptive and/or misleading price comparisons about the price for services when an au pair terminates service within one year of the date of commencement that "state or imply that it is offering … savings as to [its] product by making a direct or indirect price comparison, … without offering a clear and conspicuous basis for the price comparison" within the meaning of 940 C.M.R. § 6.05;

f.   Making false deceptive and/or misleading price comparisons to comparable services when there are substantial differences between the purportedly comparable services and the services being offered for sale by Cultural Care in violation of 940 C.M.R. § 6.05 in situations in which an au pair terminates service within one year of the date of commencement;

g.  Making disclosures and representations that violate 940 C.M.R. 3.16;

h.  Failing to disclose a partial refund policy that applies when an au pair terminates employment before the end of the program period in violation of 940 C.M.R 3.16(2); and

    i.   Applying a non-contractual partial refund policy that results in refunds that are inconsistent with Cultural Care's advertised prices, price comparisons and contractual agreements.

98.    The aforesaid violations were knowing and willful within the meaning of G.L. c. 93A.

99.    The Plaintiffs and members of the Subclass were damaged by Cultural Care's violations of G.L. c. 93A.

### COUNT FOUR
**(Class claims for declaratory and/or injunctive relief)**

100.    Plaintiffs repeat and reallege every allegation above as if set forth herein in full.

101.    Defendant is barred under G.L. c. 93A and other Massachusetts law from the pricing policies and the pricing advertisements that are complained of herein.

102.    Plaintiffs and the Class are harmed by Defendant's violations of law.

103.    Plaintiffs and the Class are at risk of being falsely induced to choose Cultural Care over other childcare providers based on Cultural Care's false, deceptive and/or misleading price advertisements and price comparisons resulting in loss of money and/or the lost opportunity to obtain the potential benefits of alternate childcare arrangements.

104.    Based on Cultural Care's use of an improperly disclosed partial refund policy, Plaintiffs and the Class are at risk of paying amounts they do not contractually owe.

105.    Absent injunctive relief, Plaintiffs and the Class will be irreparably injured in the future.

106.    An injunction will further the public interest by preventing potential future customers of Cultural Care from being misled or deceived by Cultural Care's pricing advertisement and price comparison.

107.    Plaintiffs and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of Defendant's conduct unless injunctive relief in granted.

108.    Plaintiff and the Class are entitled to a preliminary and permanent injunction enjoining the Defendants from continuing to use it existing price advertisements, its price comparisons and its partial refund policy, together with damages that are incidental to the injunction.

109.    Plaintiffs and the Class raise an actual controversy as to whether Defendant, by the conduct described herein, is in violation of applicable pricing and price advertising regulations under applicable Massachusetts' law.

110.    This Court has the authority under 28 U.S.C. §2201 to determine whether Defendant's practices violate the law.

111.    Plaintiffs and the Class are entitled to a declaratory judgment on each of the Class claims to the effect that the practices at issue violate applicable Massachusetts law.

## COUNT FIVE
### (Individual Claim for Breach of Contract)

112.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

113.    Cultural Care's conduct constitutes a breach of the contract between the Plaintiffs and Cultural Care for reasons including, but not limited to:

a.   Processing Ms. Salzmann's termination of services (transition) prior to four weeks from the date of commencement when the HFA Agreement requires a minimum of four weeks service prior to "transition" (HFA § 16);

b.   Failing to arrange for a substitute au pair and/or to provide for two weeks of additional service (transition period) from Ms. Salzmann as required by HFA, § 17; and

c.   Failure to provide a refund consistent with its advertised weekly and hourly prices.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief on behalf of themselves and the Class:

1.      Certify this case as a class action for injunctive relief under Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3) and appoint the named Plaintiffs to be Class and Subclass representatives and their counsel to be Class and Subclass counsel;

2.      Grant a declaratory judgment declaring the Defendant's weekly and monthly price advertisements as well as its pricing comparisons to be in violation of law;

3.      Grant a preliminary and permanent injunction enjoining the Defendant from continuing to use its weekly and monthly price advertisements as well as its pricing comparisons and to pay damages incidental to the injunction;

4.      Order treble actual damages or statutory damages payable to the Plaintiffs, the Class and Subclass for Defendant's violations of G.L. c. 93A;

5.      Order actual damages payable to the Plaintiffs for Defendant's breaches of contract;

6.      Award the costs of this action, including reasonable attorneys' fees and costs; and

7.      Grant Plaintiffs, the Class and the Subclass such other and further relief as this Court finds necessary and proper.

## VI.      DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 8, 2014

Respectfully submitted,

*/s/ Gary Klein*
Gary Klein (BBO No. 560769)
Shennan Kavanagh (BBO No. 655174)
Kevin Costello (BBO No. 669100)
Corinne Reed (BBO No. 687621)
**KLEIN KAVANAGH COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, Massachusetts 02114

Phone: (617) 357-5500
Fax: (617) 357-5030
Email: klein@kkcllp.com
Email: kavanagh@kkcllp.com
Email: costello@kkcllp.com
Email: reed@kkcllp.com